## Caudill et al. v. Loar.

Feb. 12, 1943.

224

J. E. Childers for appellants.

A. F. Childers for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

John D. Caudill died on April 29, 1938, a resident of Pikeville in Pike County, at the age of 84 years. Considerably more than half a century before his death he married his first wife, and the fruits of that marriage were eight children. The mother of them died some forty years before the death of her surviving husband. Following the death of that wife Mr. Caudill married a second one, who bore him eight children, all of whom, as we gather from the record, survived their father, and, perhaps, all of them except possibly one had arrived at the age of maturity at the time of his death. Among the children of decedent's first wife was a son, Will Caudill. Decedent at the time of his death—and apparently for a long while prior thereto—ran some kind of mercantile business in the city of Pikeville. He appears to have possessed a talent for accumulation of property, which, with his thrift and good business judgment, netted him a fortune at the time of his death valued around $100,000, about $45,000 of which was invested in bonds and other securities, but mostly in U. S. War bonds issued during the prosecution of World War No. 1. After deducting the value of his bonds and other securities, the remaining portion of his property consisted mostly in real estate, some of which was business property in his home town of Pikeville.

Sometime in 1920 (the exact date not appearing) decedent executed a will, the contents of which, according to the proof, were that he devised his bonds and securities to his children by his first wife. He then bequeathed to appellee and plaintiff below, Kitty Loar "the sum of $1000.00 in cash." Those two provisions were followed by bequeathing and devising to his surviving widow and her eight children the remainder of the estate, the widow to share equally with the children. After the decedent's death a search was made for any last will and testament he may have executed, but none was found;

whereupon the county court of Pike County appointed decedent's surviving widow as administratrix of his estate. Shortly following her appointment plaintiff (appellee) instituted proceedings in the Pike county court to establish and probate what she claimed was the lost will of decedent, and in which she set out its contents, its due execution, and that it had not been in any manner revoked. She further alleged that she was an illegitimate child of decedent (which fact was indisputably proven at the trial) and it was further made to appear that decedent entertained even more affection for her than he did for any of his legitimate children—he having so stated, in substance, in letters written to his illegitimate daughter, who resided at Elkhorn City, some twenty miles from her father's home in Pikeville.

The widow and all of the other heirs of decedent were made parties to that county court proceeding, and they denied in their response to plaintiff's statement of facts upon which she relied for the relief she sought, and which, as we have said, were all set out in her initial paper filed with the county court. The issues were contested in that court, resulting in it sustaining the prayer of plaintiff and appellee and in probating as the last will and testament of decedent the proven contents of his alleged will, and as allegedly contained in the one which he had duly executed. Defendants and appellants here prosecuted an appeal from the county court's judgment to the Pike circuit court, where a trial was had before a jury, followed by its verdict sustaining the judgment of the county court.

Defendants filed a motion for a new trial which the court sustained, reciting in the order that the court was of the opinion that two errors had been committed, but naming only one of them, which was, that the exhibit filed with the statement containing the contents of the alleged lost will had not been introduced before the jury, although it was made a part of the pleadings in the cause, but it does not appear that it was read to the jury. The evidence at that trial was taken down and transcribed by the court stenographer, who filed a transcript thereof in the court where the trial was had. At a later trial the parties agreed of record that the transcribed testimony of the stenographer might be read at the second trial as the testimony in the cause. However, the regular judge of the Pike circuit court who presided at the

first trial of the appeal decline to preside at the second one, and Hon. E. J. Picklesimer, a member of the Pikeville bar possessing the legal qualifications, was agreed upon as Special Judge. It was furthermore agreed that a jury would be waived at the second hearing in the circut court, and the cause submitted to the agreed upon special judge, who, after the evidence was heard by him, as so transcribed by the stenographer, rendered judgment sustaining plaintiff's motion to probate what was alleged to be the contents of decedent's lost will, and from that judgment defendants prosecute this appeal.

No time will be devoted to the question of whether or not courts may establish by parol proof the contents and due execution of an alleged lost will, since no contention or contrary argument is made against the right to do so. But were it otherwise the practice has long since been followed and has become thoroughly established in this jurisdiction granting such relief; among the earlier cases is that of Steele v. Price, 5 B. Mon. 58. From thence to the present time we have undeviatingly adhered to the practice, the cases being listed under the title of Wills in volume 19 of West's Kentucky Digest, Key 302(8). Some of the more recent ones are Baltzell v. Ates, 181 Ky. 413, 205 S. W. 548; Hoffman's Adm'r v. Hoffman, 223 Ky. 705, 4 S. W. (2d) 694; Wood v. Wood, 241 Ky. 506, 44 S. W. (2d) 539; Ferguson v. Billups, 244 Ky. 85, 50 S. W. (2d) 35; Rowland v. Holt, 253 Ky. 718, 70 S. W. (2d) 5; Singleton v. Singleton, 269 Ky. 330, 107 S. W. (2d) 273; Madden v. Sevier, 271 Ky. 688, 113 S. W. (2d) 41, and Pritchard v. Harvey, 272 Ky. 58, 113 S. W. (2d) 865. Others to the same effect cover the same period following the case of Steele v. Price, supra. See, also, annotations in 126 A. L. R. 1121, and 34 A. L. R. 1304. In all of them it is held that the burden rests upon the establisher of an alleged lost will to prove by convincing evidence (1) the due execution of the alleged will; (2) its loss or displacement; (3) its contents, and (4) the continued recognition of the will by the testator or other acts showing that he had not revoked it. So that, the only question in this case is: Whether the testimony heard upon the trial of the case was sufficient to meet that burden by plaintiff, the appellee?

At the outset it may correctly be said that burdens (1), (2) and (3) were most convincingly met by plaintiff's proof, notwithstanding counsel for defendants do-

not so concede. However, his arguments to the contrary are most technical, as well as nonconvincing. The proof of a duly executed will by decedent, its contents, and its loss or disappearance, were each and all thoroughly established, and for which reason we will devote no time nor space in referring to or amplifying any of the testimony relating to either of those requisites or burdens, and will at once take up the consideration and determination of the 4th burden supra.

The proof shows that the alleged loss or misplaced will was legally executed about the year 1920. It was witnessed by one Williamson and T. M. Riddle, the latter being 67 years of age at the time he testified, but Williamson was dead at the time of the trial. Riddle proved the due execution of the will, as well as its contents, as contended for by plaintiff. Prior thereto decedent had stated to some of his friends his intention and purpose to execute a will and to dispose of the property as testified to by Riddle, and particularly that he expected to bequeath to plaintiff, an illegitimate daughter, the sum of $1000. After the execution of the will plaintiff stated on a number of occasions to several of his friends who testified in the case, that he had executed such a will, and he continued to so express himself until only a short time before his sustaining a paralytic stroke, from which he eventually died, being unconscious from the time he became paralyzed and was removed to a hospital. The names of such witnesses so testifying need not be enumerated, since it is sufficient to say that they testified as we have stated, with no contradiction appearing in the record.

Perhaps decedent talked more frequently to Mr. Riddle, who had witnessed his will, than to any of his other friends, and at no time did he express any dissatisfaction with the will that Riddle had witnessed. Sometime after the execution of the contested will the Government called for a redemption of his U. S. bonds, and he consulted his banker, K. L. Arnold, with reference to it, and showed Mr. Arnold his will, being the same one that had been witnessed by Riddle. Since the bonds would draw no interest after the day fixed for their redemption he inquired of witness what effect the redemption of the bonds would have on his will. Witness informed him that he could execute a codicil, or distribute the proceeds

of the redeemed bonds to the devisees of them in his will, which he did after their redemption.

When decedent was taken to the hospital his two sons, Charlie (by his second wife) and Will, the latter as we have said, being by his first marriage, accompanied him. The latter (Will) took from the clothing of his father the keys to the store, his watch, and perhaps other belongings, and kept the keys until after the appointment of decedent's widow as administratrix of his estate, covering a period of some twelve days. During that time no one could enter the store building without obtaining the keys thereto from Will Caudill, and which was done on some occasions when articles therefrom were needed for household purposes. It is indisputably proven that testator kept the will witnessed by Riddle and Williamson in a safe within his store building, but without its being locked, and when searchers for the will went to the safe to examine its contents it was unlocked as decedent had always kept it.

Riddle testified that at the residence of decedent—to which his body was brought after his death occurring in the hospital—Charlie Caudill had a conversation with him with no other person present, in which the question of whether or not decedent left a will was mentioned and discussed, Riddle having informed him (Charlie) of the will that he, (Riddle) had witnessed; whereupon Charlie stated that "I know where the will is." The witness first stated that Charlie said that he knew where the will "was," but on cross-examination he explained that he was speaking about the past event of the conversation between the two and that what Charlie actually said was that he knew "where the will is." That testimony was not denied, nor objected to, even if it was incompetent, although we are inclined to believe that it was competent, since it was an admission by a party defendant to the litigation against his interest. But, however that may be, it was not objected to, and its probative effect should be considered.

Some months after that proven statement was made, Charlie was sent to the Eastern Kentucky Hospital for the insane at Lexington for an affliction which the witnesses described as "extreme nervousness." At any rate, plaintiff attempted to take his deposition, but the person in charge of the institution forbade her doing so, although notice had been given to take the deposition. The effort was then abandoned.

The chief witness introduced by defendants to refute the probative effect of the testimony thus far related was Hayes Maynard, who stated that he was a minister of the gospel, and had known decedent for many years, and that he formerly filled the office of Tax Commissioner of Pike county; that in assessing decedent's taxes the propriety of assessing a deposit account which he had in a Cincinnati, Ohio, bank—and which witness stated brought up the question of finances—was discussed and in the conversation decedent told him about the will he had executed, as witnessed by Riddle. Witness stated that he later dropped into the store of decedent, when the latter informed him that he had executed another will, which he then had in his safe and procured it, after which it was read by either decedent or the witness, who said that he did not remember which. He testified that in that conversation decedent told him about having to cash his bonds, and that he was "irritated very much about it, and in the last will he gave to his first family $5000.00 apiece and to his second family all of his real estate on Front Street" including his other personal property. He said that that conversation occurred "about 1934 or 1936." Witness further stated that the writing, so alleged to have been exhibited to him, and about which the conversation was had, was in handwriting. He was asked: "Whose handwriting?" To which he answered: "J. D. Caudill's." However, he never stated that he was acquainted with the handwriting of J. D. Caudill, nor did he relate any fact or circumstance to show his qualification to judge as to decedent's handwriting. See Stone v. Stone, 263 Ky. 732, 98 S. W. (2d) 617. He also stated that in the paper so exhibited to him the name of plaintiff was not mentioned. No one ever saw that will, so far as we have been able to discover from the record, except the witness, Maynard. It will also be perceived that the witness was unable to state the date of that conversation further than to say that it was within one year of a three year period between 1933 and 1937, but whatever year it was, witnesses for the plaintiff testified to conversations with decedent after that time in which he referred to the will witnessed by Riddle, and in which he bequeathed to plantiff the sum of $1000.

In addition to all of the foregoing, plaintiff introduced a number of letters from decedent to her—each of

them beginning "My dear daughter," and ending with "Your Dad, J. D. Caudill." The contents of all the letters were couched in affectionate expressions for his illegitimate daughter, and in one of them he informed her that he entertaind a greater affection for her than any of his other children. The only effect of such letters, if any, was to prove affection for the addressee, and his deep and abiding concern for her welfare and that of her family, and to thereby dissipate any probability that he would for any trifling reason eventually renounce or revoke the devise he had made to her in the Riddle witnessed will.

There are other circumstances in the case having a more or less convincing tendency to prove that decedent never revoked his will in which he gave plaintiff $1000, either by the execution of another one to that effect, or otherwise. To say the least of it, it is our conclusion that the proof taken as a whole was sufficient to submit the requirements of the rule supra and to sustain the finding that no revocation of the will sought to be established was ever made. The two courts through which the contest has traveled, so found, including a similar finding by a jury, but whose verdict was later set aside, but in which trial proper instructions were given. In this case, like practically all others, we have not attempted to deal or even name all of the witnesses who testified for the respective litigants on the crucial issue now under consideration, but we have given the substance of their testimony and we are convinced that under the well settled rules of practice the finding of the trial court upon that crucial fact should not be disturbed, and that conclusion has been reached with full appreciation of the quantum of proof necessary to establish the contested issue under the authorities supra.

It might be proper to add that inasmuch as all of the litigants occupying the position of defendants seem to be in accord with the settlement of the estate upon the theory of intestacy, they would be at liberty to so agree after paying plaintiff her devise of $1000; but in such event those to whom advancements had been made should account therefor and such sums be taken into consideration in calculating the total amount for distribution.

Wherefore, the judgment is affirmed.